## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **MELANIE DAMIAN, in her capacity as a court-appointed Receiver, on behalf of Surge Capital Ventures, LLC and others similarly situated,** | Case No. _____ |
| **Plaintiff,** | |
| **vs.** | |
| | **RICO CLASS ACTION** |
| **DEEL INC., a Delaware corporation, DPayments LLC, a Delaware limited liability company, and Jeremy Berger, Individually,** | **JURY DEMANDED** |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Melanie Damian (the "Plaintiff"), in her capacity as court-appointed Receiver for Surge Capital Ventures LLC ("Surge") and on behalf of all others similarly situated (collectively "Plaintiffs" or the "Class"), file this Class Action Complaint (the "Complaint") against Defendants Deel Inc. ("Deel"), DPayments LLC ("DPayments") and Jeremy Berger ("Berger")(collectively the "Defendants").

1.      This is an action to recover damages, including money paid by Surge and other members of the putative class to Deel, in connection with an enterprise involving unlicensed money transmission and money laundering around the world (the "Deel RICO Enterprise") in violation of state and federal Racketeering Influenced and Corrupt Organization Act ("RICO").

2.      The Plaintiff also seeks injunctive relief to enjoin all Defendants' future and continued illegal conduct that has caused, and continues to cause, harm to members of the Class and the public.  This harm results from, *inter alia*, Defendants' failure to implement and comply

1

with approved Anti-Money Laundering ("AML") and "Know Your Customer" ("KYC") policies and procedures as required by the Bank Secrecy Act ("BSA") and state money transmitter licensing laws, and violation of the Office of Foreign Assets Control ("OFAC")[1] regulations (including doing or enabling others to do business in Russia in violation of United States sanctions).

## PARTIES

3.      Plaintiff Melanie Damian is a court appointed Receiver in an enforcement action filed in this Court (Case No. 23-cv-22791-KMW) by the Securities and Exchange Commission (the "SEC") alleging (and finding by stipulation) violations of federal securities laws. Entities and persons over which the Receiver has control and authority include:  Accanito Holdings, LLC; Accanito Equity, LLC; Accanito Equity II, LLC; Accanito Equity III, LLC; Accanito Equity IV, LLC; Accanito Capital Group, LLC; Surge, LLC and Brent Seaman (collectively the "Accanito Entities").

4.      Surge Capital Ventures LLC ("Surge") is a Florida limited liability company having its principal office in Naples, Florida, and, as a wholly owned subsidiary and asset of the Accanito Companies, is part of the Receivership.

5.      As part of the SEC's effort to recover assets for the benefit of investors of the Accanito Entities, it petitioned this Court to approve a receivership (the "Receivership") and appoint a Receiver.  The U.S. District Court for the Southern District of Florida granted that

---

[1]  The mission of OFAC is as follows:  "The Office of Foreign Assets Control ("OFAC") of the US Department of the Treasury administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States."  https://ofac.treasury.gov (Mission).

petition and appointed the Plaintiff as Receiver;  one asset of the Receivership is this claim against Defendants.  (*See*, *SEC v. Seaman, et al.*, Case No. 23-cv-22791-KMW).

6.      Surge did business with Deel in Naples, Collier County, Florida, and in the Southern District of Florida, including, but not limited to, Miami-Dade and Palm Beach Counties, Florida, with Deel facilitating at least $2,268,912.43 in unlicensed money transmissions on behalf of Surge to third parties in Florida, around the United States, and elsewhere in the world (the "Surge Deel Payments"), including payments received by persons residing in the area comprising this federal district.

7.      Defendant Deel is a for-profit corporation incorporated under the laws of the State of Delaware with its principal place of business and headquarters located in San Francisco, California.  Although it appears that Deel is doing business in Florida as a money transmitter and as an undisclosed affiliated party and control person of, and alter ego for, DPayments and Berger, Deel has not applied for authority to act as a foreign corporation in Florida according to Florida online records.

8.      Defendant DPayments is a Delaware limited liability company authorized to do business in Florida and maintaining its principal office in St. Petersburg, Florida, and is an affiliated party of Deel.

9.      Defendant Berger is an individual residing in St. Petersburg, Florida, and maintaining an office there with DPayments.  Berger is an authorized person and affiliated party for, and agent of, DPayments and is an affiliated party, employee and/or contractor of Deel. Together with Deel, Berger is a control person of DPayments.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2). The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs, the Class will have 100 or more members, and minimal diversity of citizenship exists.

11.     The Plaintiff is a citizen of Florida and a resident in this district where she also maintains her principal office.  The Receivership includes entities doing business in this district, including payments by Surge (transmitted through Deel) to residents in this district, and persons doing business with the Accanito Entities and domiciled in this district.

12.     Defendants have purposefully availed themselves of the laws of the State of Florida, markets and promotes its products and services to residents of Florida, and have established minimum contacts with Florida by engaging in interstate commerce by use of wires as part of its business with Surge, transmitting money from and within Florida to and around the country, and as otherwise set forth in this Complaint including money transmission, Professional Employer Organization ("PEO") activities, insurance brokerage, FX and cryptocurrency (aka virtual currency) activities, lending, and more, causing it to incur obligations and liabilities in Florida and in this federal district.  In addition, Deel is the alter ego and control person of DPayments and Berger.  Finally, if Deel had been directly licensed in Florida as required by law (including with the Office of Financial Regulation that licenses and regulates money transmitters), it would have been required to consent to jurisdiction and venue (as DPayments and Berger have), and Deel cannot be allowed to escape jurisdiction by failing to do the very act that is the basis for this lawsuit.

13.     DPayments is similarly engaged in business in Florida, sought and received authority to conduct business in Florida, and has applied for a money transmission license in Florida that includes an undertaking to make itself subject to the jurisdiction of Florida courts (including this Court) and venue in this Court.

14.     Berger is a resident of St. Petersburg, Pinellas County, Florida.  In addition, Berger has engaged in regulated activities in Miami-Dade County, Florida, as a founder, director, principal and agent of Arival Bank, the source of many Deel and DPayments employees (including Berger, Anastasia Cavallini ("Cavallini") and Igor Pesin ("Pesin")) and the target of a failed acquisition attempt by Deel.  Moreover, as part of DPayment's application for a money transmission license in Florida, as DPayments' control person and authorized agent (and as Deel's controlled person), Berger has engaged in business in Florida and in this district and is subject to the jurisdiction and venue of this Court.

15.     Although not currently a named defendant, Pesin is a material witness and has said in his social media posts that he is a resident of this district (living in Miami, Florida).

16.     Venue is therefore proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because the Defendants have statutorily consented, or are required to have consented, to such jurisdiction and venue.

## GENERAL ALLEGATIONS

17.     Deel was founded in 2017 as a Delaware corporation.

18.     Deel holds itself out to the public and Plaintiffs as a global service provider which provides "payroll, compliance, HR and more in 150+ countries."

19.     Deel was formed for the purpose of encouraging the growth of the "gig" economy, at the expense of traditional employer/employee relationships.  Deel's business model includes transitioning employees to consultants and transmitting money on their behalf around the world while not in compliance with applicable state and federal labor, money transmission, anti-money laundering and other licensing laws and regulations.

20.     Deel operates with businesses, firms, and industries including many firms in high-risk industries such as proprietary trading and cryptocurrency, industries that most licensed and compliant financial firms avoid because their BSA/AML policies prohibit it as too risky and lacking a way to ensure legal compliance.

21.     One such firm that Deel partnered with was Binance, a cryptocurrency exchange founded by now-jailed Changpeng Zhao, a Chinese-born Canadian businessman (and Canada's richest person) who plead guilty in 2024 to a U.S. money laundering charge filed in 2023.  In November 2023, Binance announced it would no longer accept its BUSD "stable coin" as a withdrawal method for Deel, thus forcing Deel to rely on other crypto partners after Mr. Zhao was arrested and later convicted of money laundering.

22.     In spite of this risky client profile, Deel markets itself as the best firm to help "companies hire workers legally and compliantly around the world"  with the "most robust compliance in the industry:"

## The most robust compliance in the industry

When hiring globally, a lot of companies tend to make small mistakes that lead to significant compliance issues. Quite often, companies don't localize their employment agreements to suit local laws or correctly check whether contractors are set up correctly to work in their country. For employees, each country has different requirements for providing benefits, local government fees, pensions and more which is hard for any business to navigate compliantly. Deel takes care of everything for you, so you can focus on your business.

23.     Deel's claimed "robust compliance" is accompanied by an invitation to customers to "stay compliant" and "ensure benefits compliance" by hiring Deel:



24.     While stressing that Deel has the "most robust compliance in the industry" and can "[e]nsure benefits compliance," Deel's CEO candidly admitted in an online interview that Deel's entire business purpose was to disrupt the current highly regulated model of employment and replace it with a "gig" model of its own creation – one designed to classify (or misclassify) most employees as independent contractors.[2]

25.     As a demonstration of how such misclassification works, Deel initially classified its own CEO, a full-time employee, as an independent contractor.   After Congressional investigations and media questioned Deel's CEO's classification as an independent contractor, Deel, implicitly acknowledging its misclassification, re-classified him as an employee to reduce government scrutiny.

---

[2]  *See*, https://open.spotify.com/episode/5OZYlGjbafvK7F07UKSvGh , part 1: 10:25 and part 2: 18:25 quoted here: "The real underlying mission of Deel, which some people might challenge, but that's what really drives us, is that the way we're looking at it today is making people that are working as a contractor on par with their employee counterparts."  As Deel expected, "some people" are challenging the "real underlying mission of Deel," including the Plaintiff and numerous regulators.

26.     Another feature of Deel's attempted disruption of the traditional highly regulated employment relationship, when Deel does follow the law and properly classifies employees as such rather than as independent contractors, Deel's and Deel's clients' employees are somehow always exempt (salaried) employees, regardless of their position, and thereby deprived of potential overtime and other benefits payable to non-exempt employees.

27.     As part of their mission to convert employees to contractors, empowering them to move money around the world without AML type "hassles" and while bypassing licensing requirements for many regulated activities, Defendants have failed to become legally compliant or ensure that their customers are legally compliant, and in the process, have violated state and federal law.

### Money Transmitter Laws and the Deel RICO Enterprise

28.     Chapter 95 of Title 18 of the U.S. Code, entitled "Racketeering," expressly prohibits persons from operating an "unlicensed money transmitting business which affects interstate or foreign commerce in any manner or degree and is operated without an appropriate money transmitting license in a State where such operation is punishable . . . under State law." 18 U.S.C. § 1960. For purposes of federal racketeering statutes, "money transmitting "includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2).

29.     For the reasons alleged in this Complaint, the Defendants operate as an illegal enterprise as defined by the laws of the United States and of the State of Florida (the "Deel RICO Enterprise").

30.     The allegations of this Complaint detail some of the illegal activities of the Deel RICO Enterprise.

31.     Central to Deel's business operations is the transmission of money between "contractors" without compliance with money transmission laws and regulations created to reduce or eliminate money laundering activities in Florida and other states and across the globe, and to protect consumers, including the Plaintiff and the Class.

32.     By failing to register and become licensed, and failing to adopt and implement effective BSA/AML/OFAC policies and procedures to prevent and detect money laundering and other violations of applicable law, the Defendants make it easier and more likely that bad actors may transmit money without detection and, as seen below, make it easier to do business with our nation's enemies in violation of national sanctions (such as those currently in force against Russia).

33.     State and federal regulations apply to money transmitters, with federal regulation defining a "money transmitter" as:

> (A) [a]ny person, whether or not licensed or required to be licensed, who engages as a business in accepting currency, or funds denominated in currency, and transmits the currency or funds, or the value of the currency or funds, by any means through a financial agency or institution, a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both, or an electronic funds transfer network; or
>
> (B) [a]ny other person engaged as a business in the transfer of funds.

31 CFR 103.11(uu)(5).

34.     Each Defendant is a "money transmitter" as defined by federal law.

35.     In Chapter 560 (Money Services Businesses), Florida contains statutory definitions applicable to money transmitters. Section 560.103 defines a money transmitter as follows:

> "Money transmitter" means a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which

9

receives currency, monetary value, a payment instrument, or virtual currency for the purpose of acting as an intermediary to transmit currency, monetary value, a payment instrument, or virtual currency from one person to another location or person by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country. …

Fla. Stat. Ann. § 560.103(24) (West).

36.     Deel is a "money transmitter," and DPayments and Berger are "affiliated persons" and "control persons," as defined by Florida law and the laws of numerous other states.

37.     Fla. Stat. Ann. § 560.103(23) defines "money services business" as including "any person located in or doing business in this state, from this state, or into this state from locations outside this state or country who acts as a payment instrument seller, foreign currency exchanger, check casher, or money transmitter."

38.     Moreover, even if Defendants are not required to be licensed by state or federal law (though they are so required), each is defined as a "money transmitter" under federal law and is subject to those requirements.

39.     Each of the Defendants is engaged in a "money services business" as defined by Florida law and the laws of other states.

40.     Fla. Stat. Ann. § 560.125 provides, "[a] person may not engage in the business of a money services business or deferred presentment provider in this state unless the person is licensed or exempted from licensure under this chapter." Fla. Stat. Ann. § 560.125 (West).

41.     Acting as an unlicensed money transmitter in Florida is a criminal act:

(5)   A person who violates this section, if the violation involves …

(c)   Currency, monetary value, payment instruments, or virtual currency of a value totaling or exceeding $100,000 in any 12-month period, commits a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
Fla. Stat. Ann. § 560.125(5)(c).

42.     As of this date, no Defendant appears to be licensed in any capacity under Chapter 560 or exempt from such licensing, and each is required to be so licensed.

43.     To qualify for a license as a "money services business," an applicant must, *inter alia*,

> (1) Demonstrate to the office the character and general fitness necessary to command the confidence of the public and warrant the belief that the money services business or deferred presentment provider shall be operated lawfully and fairly.
> (2) Be legally authorized to do business in this state.
> (3) Be registered as a money services business with the Financial Crimes Enforcement Network as required by 31 C.F.R. s. 1022.380, if applicable.
> (4) Have an anti-money laundering program in place which meets the requirements of 31 C.F.R. s. 1022.210.
> (5) Provide the office with all the information required under this chapter and related rules.

Fla. Stat. Ann. § 560.1401 (West).

44.     As of this date, no Defendant has satisfied the foregoing Florida licensing requirements as set forth in Chapter 560.

45.     The definition of "money transmission" in Florida and the related licensure requirements are substantially similar to those of other states and generally consistent with uniform acts adopted by each of those states, thus aiding this Court's management of this case as a class action.  In addition to Florida, forty-seven other states have statutory money transmitter laws and licensure requirements (a summary is attached as Exhibit A).

46.     As regulatory cover for its unlicensed payment activities, Deel maintains a section on its website describing payments[3] yet has no money services business registrations with any state or with FinCEN.  In Deel's terms of service,[4] section 9.2 provides that Deel uses "supported

---

[3]  www.deel.com/payments

[4]  www.deel.com/terms-of-service

payment methods" and that it is a "limited payment agent for Contractors … [that] partners with payment service providers" including money transmitters.   Under section 9.3, Deel says its customers are subject to KYC requirements although its documentation section regarding international payments is very limited.

47.     Assuming a legitimate partnership with money transmitters (the Plaintiff is unable to verify any such partnership despite repeated requests from her counsel to Deel's counsel for licensing related information), such a partnership would still be required to satisfy licensing and AML requirements.   In addition, Deel appears to be acting as an agent and, as such, must have contracts that comply with state money transmission laws and KYC/AML processes that satisfy FinCEN and state requirements.   Deel's partnerships with Russian entities intent on avoiding sanctions makes clear that those requirements are not being satisfied.

48.     In addition, Deel provides for "one bulk payment" for payroll, likely meaning there is no individualized KYC/AML for payees, only a bulk business account.   Such a procedure is unlikely to be approved by a legitimate money transmitter "partner."

49.     As part of its unlicensed money transmission activities and in collusion with Russian banks, by enabling contractor payments to be made without supervision or compliance with BSA/AML/OFAC and state licensing laws,[5] Deel appears to be trading (or supporting others

---

[5] A highly troubling example is the laundering by Iran of illegally obtained proceeds from the sale of oil. *See*, The Economist, *How to Defy America* (October 19, 2024).  That author describes how Iran is "covertly laundering billions of dollars via the global banking system…" https://www.economist.com/finance-and-economics/2024/10/17/inside-the-secret-oil-trade-that-funds-irans-wars and how Iran, "with patchy enforcement, determination and help from a greedy partner, a country under a de facto global embargo can end up flouting it on a cosmic scale." Deel unlicensed activities make it another "greedy partner" to Russian efforts to evade sanctions and launder money.

in trading) with Russia in violation not only of money transmission licensing laws but also U.S. sanctions prohibiting trading with the enemy and, in particular, Russia.

50.     While Deel recently updated its website to state that its Russian contractor clients can no longer (as of May 3, 2024) "facilitate withdrawals to Russian bank accounts," Deel nonetheless stands ready to *guide its contractors through other countries* in order to avoid the "uptick in scrutiny" and still transmit money and make payments to Russian "contractors:"

> …there's been a notable uptick in scrutiny across the [Russian] region and it's generally not recommended to send money into Russia cross-border anymore. … To provide a solution, we've developed two secure and compliant options …[including] the option [for our clients] to engage their contractors as employees who are paid locally through our Employer of Record (EOR) model… To assist, we've reduced our price … for onboarding …"[6]

51.     Deel's "solution" allowing it to transmit money in the face of sanctions includes its failing to become licensed and compliant with anti-money laundering laws and regulations and offering workarounds to the "uptick in scrutiny" that enable Defendants' customers to avoid sanctions rather than comply with them.

52.     On its website Deel states, "Deel helps thousands of companies expand globally with unmatched speed and flexibility. It's global hiring, HR and payroll in just one system."[7] And "Deel does it all (while keeping you compliant)."

53.     Deel also claims that it can process payments for employees and contractors "without unnecessary fees or hassle."[8]

---

[6]   *E.g.*, https://help.letsdeel.com/hc/en-gb/articles/4485661490065-Important-Updates-Relating-to-Russia-and-Ukraine#:~:text=Independent%20Contractors%20and%20Shield%20Contractors%20with%20pending,a%20foreign%20bank%20account%2C%20from%20a%20foreign

[7] https://www.deel.com/deelswitzerland. Accessed on December 8, 2024.

[8] https://www.deel.com/about

54.     Although Deel has certainly reduced the "hassle" of legal compliance in connection with moving money around the planet, it has done so by failing to obtain the proper licenses and failing to comply with legal and regulatory requirements.

55.     At its core, Deel's entire business model was built on the fiction that the world needs no employees, only contractors, and that global payments needs no policing, only movement.  With this model, Defendants have conducted the criminal Deel RICO Enterprise:

    a.  Deel moved into highly regulated industries generally requiring licenses without applying for or receiving licenses, including the following industries, products and/or services:

        i.  Money transmission (payment) activities where Defendants have:

            1.  Failed to obtain the statutorily required money transmission licenses;

            2.  Failed to adopt and implement approved and regulated BSA/AML/OFAC policies and procedures;

            3.  Used the "Deel Card" and "Deel Wallet" to launder (or wash) contractor payments made in fiat currency and cryptocurrency without subjecting them to BSA/AML/OFAC and KYC policies and procedures;

            4.  Attempted to obtain (or obtaining) money transmission licenses ("MTLs") after the fact not in its name but in the name of DPayments, and seeking authorization to do business under that name while avoiding the name "Deel" since Deel has engaged, and

continues to engage, in money transmission activities in its name with no money transmitter's license (a disqualifying event);

5. Hired Berger as the public "face" for DPayments and applying for licenses in that name without fully disclosing to all regulators that DPayments is an affiliate and successor to Deel, and Berger's role in the failed BSA/AML/OFAC policies of Arival where Berger utterly failed to create and implement legally sufficient policies while employed with Arival Bank,[9] a crypto bank formed to "bank" high-risk customers while lacking any meaningful BSA/AML/OFAC policies;

6. Conducted an unlicensed money transmission business in Russia by, *inter alia*:

   a. facilitating transfers of money (including conversion from and to Russian Rubles) to Russian "contractors" in Russia in violation of sanctions prohibiting such activity; and

   b. doing business with Russian banks on OFAC SDN[10] sanction lists, and promoting that business on sanctioned Russian bank and other websites;

---

[9] Mr. Berger identifies as a "Co-Founder @ Arival Bank" and a "Fintech Executive | Regulatory Expansion" in his LinkedIn resume. He also claims under "Experience" to have been Arival's "Co-Founder, Board Member & Chief Operating Officer" while the OCFI Order (*infra* at n. 11 and at Exhibit D) identifies him as Arival's "Treasurer and Director." These titles appear as fluid as their respective duties but clearly include executive responsibility for the acts and omissions of Arival.

[10] "As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups,

7. Failed to implement effective BSA/AML/OFAC policies and enforcement procedures or hire competent compliance personnel, for example:

   a. Hiring Berger's Russian colleague at Arival Bank, Anastasia Cavallini, as Deel's BSA/AML Officer despite (or because of) her activities while employed at Arival Bank as its Global Head of Compliance and Governance that caused Arival to fail its regulatory examination (especially regarding its BSA/AML/OFAC activities) for which Cavallini was responsible and, according to Arival's banking regulator OCFI, posed "serious damage or imminent danger to the safety of the industry, the citizens or the public order."[11]

      i. With respect to compliance specifically, the OCFI further found serious (and potentially fatal) violations as more specifically set forth herein beginning *infra* at para. 83 - 98;

   ii. Professional Employer Organizations ("PEOs") offering insurance and employee benefits;

---

and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs." Their assets are blocked and U.S. persons are generally prohibited from dealing with them."  https://ofac.treasury.gov/faqs/topic/1631

[11]  OCFI Consent Order In the Matter of Arival Bank International Corp., Case No.: OCFI-2024-D-IFE-65-3036-03 (August 19, 2024)(the "OCFI Order").

    iii.  Employee and consumer loan products (including, *e.g.*, Earned Wage Access products);

    iv.  Life and health insurance brokering and sales production of products and services;

    v.  Foreign currency exchange and trading;

    vi.  Cryptocurrency (aka virtual currency) exchange;

b.  To create more contractors for whom Deel could process payments as part of its Deel RICO Enterprise, Deel further sped things up by failing to comply with employment practices laws such as state and federal labor, wage and hour laws by, for example:

    i.  routinely misclassifying its and its platform clients' employees as independent contractors (including the preposterous characterization of its own CEO as an independent contractor);

    ii.  refusing to pay employees overtime (accommodated by Deel's misclassification of independent contractors) and documented in its written Deel Employee Handbook: "We do not provide overtime compensation. We do not provide compensatory time off (comp time) instead of overtime pay" and

    iii.  knowing that this practice is unlawful, Deel offers a product called "Deel Shield" intended to encourage employers to follow Deel's advice to

misclassify employees as contractors by "shielding" those employers from government audits and classification liabilities.[12]

    c.   Congressional investigations[13] have been launched by members of Congress into some of these practices by Deel.  In partial response, Deel remedied its own CEO's misclassification (changing from independent contractor to employee), and hired former politicians and government officials to lobby for regulatory forgiveness since Deel had not sought regulatory permission.[14]

56.    In late 2023 Deel purported to remedy a licensing violation in Florida by obtaining (after-the-fact) a PEO license.[15]  Later, Defendants formed DPayments (in early 2024 after Deel hired Berger) as part of a similar remedial effort to obtain money transmission licenses that Deel was required to have had for years;  in doing so, Defendants chose not to use the name "Deel."

---

[12]  Another form of "Deel Shield" protection is available to "reduce all risks" of sanctions violations, *infra* at para. 75.

[13]  Congressman Adam Schiff and other members opened a Congressional investigation in 2023. Such investigations are becoming increasingly common in areas of national concern:  "As the 2024 legislative session commences, Congress is poised to focus on conducting investigations of not only the Biden administration but also the private sector. With most legislative activity largely stalled until after the election in November, Congress' attention will naturally gravitate to investigations. In 2024, congressional committees have ramped up several ongoing investigations and signaled new investigations of several industries." https://www.mayerbrown.com/en/insights/publications/2024/01/us-congressional-investigations-continue-to-pick-up-steam-as-2024-begins

[14]  For example, in 2024 Deel hired Washington insiders and power brokers Elaine Chao (married to Senate Minority Leader Mitch McConnell), former Sen. Heidi Heitkamp (D-ND), former acting Labor Secretary Seth Harris and Charlotte Cordy, and former banking and consumer finance commissioner in Mississippi.  According to Deel, these political powerhouses will "stay close to our product and business roadmap…"  https://www.deel.com/blog/deel-advisory-board/  Deel has not said whether they will also support its BSA/AML/OFAC policies and procedures.

[15]  *See*, PEO Florida OFR findings, *infra* at para. 107.

57.     Deel has knowingly processed payments and transmitted monies without proper licensing despite these activities requiring money transmission licenses in Florida and other states and requiring implementation of regulator-approved and effective BSA/AML/OFAC[16] policies, procedures and consumer safeguards.  By offering regulated services, Defendants have implicitly promised the Class that they have and had all necessary licenses to engage in the businesses of money transmission, PEO, payments, crypto, FX, insurance, immigration,[17] and other lines of business engaged in which they engage.  Defendants did not have all required licenses and related compliance procedures, however, and thereby directly injured the Plaintiff and the Class.

58.     The acts and omissions of Deel were aided and abetted by DPayments and Berger and have harmed the Plaintiff and the Class by, *inter alia*, operating the Deel RICO Enterprise as a criminal enterprise in violation of the licensing requirements of 18 U.S.C. § 1960; failing to obtain regulatory approvals and related background checks, oversight, financial condition review, implementation of effective BSA/AML/OFAC policies and procedures (and employment of related qualified personnel and compliance officers), and other consumer protections that accompany such licensing and regulation.

---

[16]     Bank Secrecy Act, Anti-Money Laundering, and Office of Foreign Assets Control (respectively).

[17] Deel advertises services that appear to include legal advice regarding immigration from and between many countries, including the U.S.A.  Discovery will confirm whether Deel has been engaged in the unauthorized practice of law in this regard and, if so, whether it was in furtherance of the Deel RICO Enterprise.

**T-Bank (Tinkoff Bank) and Other**
**Russian Banking Affiliates in the Deel RICO Enterprise**

59.     An additional part of Deel's "solution" has been for Deel to partner with Russian

banks including T-Bank (fka Tinkoff Bank but changed because of European sanctions), a Russian

bank on OFAC's SDN prohibited list.

60.     As a part of the Deel RICO Enterprise, Deel advertises (even post-sanctions) that it

is "hassle-free" for global employers to hire – and pay –  Russians:





61.     In addition, Deel maintains (or did maintain) guides to help foreign businesses pay contractors and employees in Russia.  As recently as last month, Deel continued to actively hire in Russia.[18]

62.     In order to better process money payments and transmission in Russia, Deel has partnered with T-Bank despite its presence on OFAC's prohibited list.

63.     This is a partial timeline of events related to the Defendants' business activities in Russia:

| Date | Event |
|---|---|
| April 6, 2022 | United States prohibits any "new investment" in the Russian Federation |
| May 8, 2022 | OFAC prohibits the provision of "management consulting services," including "staff augmentation and human resources policies and practices" to any person in the Russian Federation. |
| June 6, 2022 | OFAC issues guidance making clear that prohibited "new investment" includes "[e]ntry into an agreement requiring the commitment of capital or other assets for the establishment or expansion of projects or operations in the Russian Federation, including the formation of joint ventures or other corporate entities in the Russian Federation" |
| October 10, 2022 | Letsdeel Services LLC ("Letsdeel"), a Russian entity affiliated with Deel Inc., is incorporated in Russia. |
| February 2023 | EU sanctions T-Bank. |
| May 2023 | UK sanctions T-Bank. |
| July 2023 | US sanctions T-Bank (adding to SDN List). |
| August 2023 | T-Bank launched GtPaid as a sanctions workaround via "intermediaries" |
| June 2024 | T-Bank promotes Deel as an available foreign payment method for Russians |
| October 27, 2024 | T-Bank / Deel partnership discovered on website |
| October 31, 2024 | T-Bank scrubs references to Deel. |

---

[18]     https://jobs.ashbyhq.com/Deel/dc7942ed-5623-459c-9dac-ff5a1eb53478?__hsfp=1759453599&__hssc=29278755.1.1731981894453&__hstc=29278755.a3d0784c5a7d85663daa17a397a1eaed.1710203321363.1731489782789.1731981894453.65&locationId=97ad4f1b-217b-4053-b0ec-9afe27b777f8

64. After OFAC added T-Bank to the SDN List in July 2023, Deel and all other US companies have been prohibited from engaging in any transactions or other dealings involving T-Bank, yet those dealings continued.

65. In August 2023, T-Bank (or an affiliate) launched GtPaid to facilitate Sanctions Evasion via "Intermediaries" such as Deel:[19]



66. In an August 30, 2023 blog post, T-Bank wrote:

"T-Bank has launched the GtPaid service, which helps Russian IT companies work with foreign customers and accept payments in rubles for services to a local account. A foreign company does not risk falling under sanctions . . . . **GtPaid works through T-Bank's foreign partners, who act as intermediaries between you and the counterparty**." (emphasis added)

67. In June 2024, T-Bank explicitly identified Deel as a vehicle to process payments in a blog entitled "How to Accept Payments from Foreign Clients Under Sanctions? 7 Current Methods."[20]

68. After describing the sanction-related difficulties encountered by Russians wanting to receive payments from abroad, T-Bank revealed that Deel was available to process payments

---

[19] https://www.tbank.ru/business/blog/gtpaid/

[20] https://secrets.tinkoff.ru/blogi-kompanij/aktualnye-sposoby-polucheniya-oplaty-iz-za-granicy/

and transfer funds to T-Bank. Moreover, T-Bank stated in its frequently asked questions that such ruble-related payment transactions can involve "dollars," indicating that T-Bank and Deel may be abusing the U.S. correspondent banking system as part of this sanctions evasion scheme.

69.     Most recently, in October 2024, T-Bank continued to refer Russians to Deel in order to transmit money to or from Russia.[21]  Specifically, on a page entitled "International Payments with Gtpaid," T-Bank outlined how Russians could "Resume work with foreign customers" by "Receiving transfers via the Deel platform" as shown in the screenshot below of the English version of T-bank's website dated Oct. 29, 2024:



70.     For clarity and emphasis, T-Bank explained in its frequently asked questions that this payment process will not create sanctions risks for customers because "the money does not go directly to the Russian account" implying that using Deel —> GtPaid is a good way to evade sanctions:

---

[21]     https://web.archive.org/web/20241009210818/https://www.tbank.ru/business/account/it-companies/ved/#expand (October 9, 2024, from internet archives).

**Are there any sanctions risks for my foreign customers?**

Your customers sign a contract with a foreign partner of T-Bank and transfer payment to them — the money does not go directly to
the Russian account. This reduces the likelihood that the customer will be subject to sanctions and the payment will be blocked.

71.     As recently as October 29, 2024, T-Bank's website explained (in Russian) that its

"partner" Deel will transmit money in Rubles to Russians:

> Прием переводов через платформу Deel
> Если заказчик платит с помощью Deel, наш партнер поможет получить
> деньги в рублях на счет в Т-Банке. Дополнительно нужно будет
> оплатить комиссию платформы английский

> [English translation:]  Receiving transfers via the Deel platform If the
> customer pays via Deel, our partner will help to receive money in rubles to
> the account in T- Bank. Additionally, you will need to pay the platform
> commission.

72.     A copy of a screenshot of T-Bank's description of its partner Deel's money

payments services is attached as Exhibits B (Russian) and C (English).

73.     Deel also partners with other Russian companies that advertise ways to bypass U.S.

sanctions.   For example, Unlock-money.com highlights its Deel partnership as another way to

avoid sanctions on its "Sanctions, Money, and Payments" website page:

24



**Санкции, Деньги, Платежи**

**ОТЗЫВЫ О НАШЕЙ РАБОТЕ**

Публикуем отзывы о нашей работе по платежам и переводам.

Напоминаем, что мы помогаем в решении следующих вопросов:

**ОПЛАЧИВАЕМ:**
- Зарубежные сервисы
- Любые отели и апартаменты (booking, airbnb и др.)
- Авиабилеты
- Обучение
- Любые инвойсы и счета
- Товары

**ПРИНИМАЕМ ПЛАТЕЖИ из-за РУБЕЖА:**

1 Клиент переводит деньги на банковский расчетный счет одной из наших компнаий, зарегистрированных в США и ЕС - выставляем инвойс принимаем платежи в долларах или евро.
2 Клиент оплачивает ваши услуги своей иностранной картой - у вас будет ссылка и платежная страница, пройдя по которой клиент производит оплату картой.
3 У вас есть сайт, через который вы продаете свои товары и услуги. Мы настроим полноценную платежну API-интеграцию с вашим сайтом - клиенты из других стран смогут производить оплаты картами, PayPal, AliPay прямо на нем.
4 Вы работаете с зарубежной компанией через Deel, мы сможем вывести средства с вашего аккаунта.

Выплаты вам мы производим, либо рублями на российскую карту, либо в криптовалюте.

Sanctions, Money, Payments

REVIEWS OF OUR WORK

We publish reviews of our work on payments and transfers.

We remind you that we help in solving the following issues:

WE PAY FOR:
- Foreign services
- Any hotels and apartments (booking, airbnb, etc.)
- Air tickets
- Training
- Any invoices and bills
- Products

WE ACCEPT PAYMENTS FROM ABROAD:

1 The client transfers money to a bank account of one of our companies registered in the USA and the EU - we issue an invoice and accept payments in dollars or euros.
2 The client pays for your services with their foreign card - you will have a link and a payment page, after which the client makes a payment by card.
3 You have a website through which you sell your goods and services. We will set up a full payment API integration with your website - clients from other countries will be able to make payments by cards, PayPal, AliPay directly on it.
4 You work with a foreign company through Deel, we will be able to withdraw funds from your account.

We make payments to you either in rubles to a Russian card or in cryptocurrency.

74. Similarly, Easy-payments.online is a Russian company explaining to its customers "how to receive payment from abroad under sanctions" using Deel:

EASY PAYMENTS Company Registration ⌄ Bank accounts ⌄ Additional services ⌄ Information ⌄

★ 5 04.04.2024 • Payment systems 10 minutes to read

The question of how to accept payments from abroad has become especially acute for Russian entrepreneurs in recent years. Due to the introduction of sanctions, many familiar payment methods have become unavailable, after which companies have been forced to look for new options.

We tell you how to receive money from foreign clients in 2024 and how to continue using international payment systems even under sanctions.

**Deel**

Deel is a service that allows you to organize international payments. A foreign customer transfers payment for the services of a Russian company or individual to the account of this platform, after which the money can be withdrawn to your personal or business account in the required currency.

The system offers a number of convenient tools for organizing payments, including working with documentation, calculating taxes, etc. There is a proprietary map. Deel tools are flexible enough to make the service convenient for both a large company and a private freelancer.

75.     In order to encourage its clients to avoid sanctions and use Deel's payment services, Deel offers a form of "Deel Shield" (similar to that used to protect employers who misclassify employees at Deel's suggestion, *supra* at para. 55.b):[22]

**Deel Shield**

**Deel Shield** is a new product that is somewhat similar to Employer of Record, but here Deel does not hire a person, but contracts for a company.

> *The service is in high demand in our region: if investors do not want to see a connection with Russia or Belarus, then this product reduces all risks.*

Deel signs a contract with a specialist and a service agreement with the company: the contractor signs an MSA and SOW with Deel. The client company in this case has full autonomy, flexibility and pays taxes independently. The cost of the service is $325 per person per month.

76.     Deel also offers misleading comfort for its customers by, *e.g.*, claiming to be "backed by the best [investors] in the business" such as the noted venture capital firm of Andreesen Horowitz (aka a16z), an early investor in Deel (and likely having the authority to appoint a board member or observer).

---

[22] https://www.bicc.co/news/kak-rabotat-cherez-deel-obzor-vozmozhnostej-i-novyh-produktov/

77.     The U.S. Treasury, the Federal Reserve, the Office of the Comptroller of the Currency and the U.S. Treasury's Financial Crimes Enforcement Network (FinCEN), together with law enforcement officials around the world, are tasked by Congress with enforcing these extremely important laws.  One recent example demonstrates the national security importance of such enforcement.

78.     In October 2024, the U. S. arm of T.D. Bank plead guilty to charges that it failed to stop drug traffickers and money launderers and agreed to pay over $3 billion to resolve criminal and civil charges.  U.S. Attorney General Merrick Garland summarized the crime on X as follows: "TD Bank created an environment that allowed financial crime to flourish. By making its services convenient for criminals, it became one."

79.     By making its services convenient for criminals, Deel similarly chose to become one.

80.     Another example of the importance of fighting money laundering crimes is the settlement by OFAC with CoinList Markets LLC "CoinList" in late 2023 resulting from CoinList's processing transactions for Russians in violation of U.S. Russia sanctions.  Like Defendants, CoinList was trading with the enemy, but unlike Defendants, CoinList had KYC and OFAC screening procedures in place, but they failed to capture users claiming to be residents of a non-embargoed country providing Russian addresses.

81.     Building on the strength of Deel's relationship with T-Bank, Unlock-money.com and other Russian persons, Deel announced on November 27, 2024, its acquisition of Atlantic Money, a UK licensed fintech company with payment services licenses in the U.K. and the E.U.

(but not the U.S.).[23]  Three of the twelve employees to be acquired were formerly employed by T-Bank, including the Vice-president of engineering and former Chief Technology Officer of Tinkoff Invest.[24]

82.     Such activities reinforce Defendants' commitments to the Deel RICO Enterprise by strengthening their relationships in and around Russia, despite the risks posed to the U.S. and global fight against money laundering.[25]

### Deel's Chief Compliance Officer (Trained in Russia) and Berger Share Responsibility for Egregious BSA/AML/OFAC Violations at Arival Bank

83.     In addition, Defendants have hired other Russian trained employees known to have failed to comply with BSA/AML/OFAC requirements in the U.S.

84.     Berger and Pesin claim to have founded the Puerto Rico-based Arival Bank ("Arival") in 2018 as a U.S. licensed "bank" to service high-risk clients in the crypto and consultant (gig) communities.  Thus, Arival catered to the same type of risky clientele as Defendants.

---

[23]   https://www.linkedin.com/posts/atlanticmoney_uk-fintech-ugcPost-7267547384690180096-BItE?utm_source=share&utm_medium=member_desktop

[24]                                                                     https://www.linkedin.com/in/nikita-melnikov/   and   https://www.linkedin.com/in/gpevnev/, https://www.linkedin.com/in/georgii-kirilenko/

[25]   Defendants are not alone in their Russian activities: "U.K. fintech Stenn collapsed into administration [bankruptcy] after a reference to the company in a US criminal indictment about a Russian money laundering scheme prompted its lenders to begin probing potentially suspicious transactions …. Stenn's collapse is likely to cast a spotlight on the due diligence carried out by its banking partners and big investors, particularly as a former auditor of the fintech had resigned over concerns about some transactions and [Stenn founder and CEO] Karpovsky was previously involved in a Russian invoice finance company that later collapsed amid fraud allegations." https://www.ft.com/content/182839d7-f2d2-4a65-be10-3371630eb59b?desktop=true&segmentId=7c8f09b9-9b61-4fbb-9430-9208a9e233c8#myft:notification:daily-email:content

85.     Like Berger, Pesin "resigned to the Board" of Arival in May 2023 (per the Order); and like Mr. Berger, he was an officer (President) and Director during the time period of so many compliance failures outlined in the Order.

86.     In Pesin's LinkedIn resume, he identifies as a "Fintech and banking doer" and "Deel's Fintech and Licensing" leader who lives in Miami Beach, Florida. He also identifies his "Top Skills" as "Regulatory Compliance," "Licensing" and "Crypto Banking" with Russian as his native language and some fluency in Spanish and English.

87.     Moreover, Pesin claims to be a "Co-founder and Board Member at Arival Bank" from 2018 until 2022, yet in the same resume, says he was "Co-Founder, Board Member, [and] CFO" until February 2023. And yet a third date of resignation, May 2023, is identified by the Commissioner in the Order.

88.     Whatever the dates, it is clear that Pesin was a senior C-Suite officer (CFO per Pesin, President per the Order) and a Director from the date of Arival's founding until approximately May 2023, that being the same period examined – and excoriated – by the Commissioner in the Order. It also is clear that Pesin, burdened with that history, was nonetheless hired by Deel to lead "Fintech and Licensing" in order to employ his "top skills" of "regulatory compliance, licensing and crypto banking."

89.     At Arival Bank, Berger and Pesin (also board members and officers) hired Russian trained Cavallini as Arival's Global Head of Compliance and Governance, a title and position with enormous regulatory compliance and supervisory responsibilities for which she was unprepared.

90.     Following a thorough investigation, the Puerto Rico Office of the Commissioner of Financial Institutions (OCFI) took anti-money laundering enforcement action against Arival and, on August 19, 2024, issued a Consent Order against it (the "Arival OCFI Order")(Exhibit D). In

that order, the OCFI found repeated, flagrant and egregious violations of the U.S. Bank Secrecy Act (BSA), Anti-Money Laundering (AML) laws and Office of Foreign Assets Control (OFAC) requirements.

91.     The type of Arival violations detected by OCFI empower bad actors around the globe and are the very reason state and federal laws require licensing of money transmitters such as the Defendants.  Arival's lack of adoption and implementation of effective BSA/AML/OFAC compliance programs was the key finding in the Order and the Report (unavailable to the public):

III.     **General Objectives of this Consent Order**

The OCFI has the obligation to execute the legislative mandate of protecting the welfare of the consumers that use financial services. The OCFI ensures that financial institutions operate in an adequate manner, in compliance with applicable laws and regulations. Therefore, in view of the above, pursuant to the powers and authority granted to the Commissioner, this Order prevails as consented between the Commissioner and the Entity to attain the following general objectives through the specific actions described in and agreed to in this Order:

1. Operate the Entity in a commercially reasonable manner with safe and sound policies and procedures.
2. Improve Board level and quality of oversight and support over management, in compliance with this Order.  Increase the Board composition, with an independent director(s). Include a secretary of the Board.
3. Develop Board and Committee minutes that include discussion of financial results, and other decisions of the Board.
4. Implement effective BSA/AML and OFAC compliance programs. Address all internal control deficiencies of Bank Secrecy Act (BSA) compliance program, correct all violations to local laws and regulations, and consider all apparent violations to federal regulations, as cited in the Report.
5. As described in this Order, develop a Strategic Plan, a Profit Plan and attainable Annual Budget that should be periodically reviewed for updates. Any deviations from the Annual Budget should be quantified, explained, and reported to the Board.

2

92.     More specific findings by the OCFI during the time Arival Bank was managed by current Deel employees (including its Chief Compliance Officer) include ordering Arival Bank to (a) cease and desist from all violations of law;  (b) implement safe and sound policies and procedures;  (c) improve Board level and quality of oversight and support over management;  (d) implement effective BSA/AML and OFAC compliance programs;  (e) address all internal control deficiencies of the Bank Secrecy Act (BSA) compliance program;  (f) correct all violations to local laws and regulations;  (g) remediate all violations to federal regulations;  (h) operate in compliance with laws and regulations, and address apparent violations;  (i) through its Board, submit within 30 days a written plan addressing all shortcomings and violations;  (j) hire an Independent Director;

(k) develop and submit for Commissioner review a Strategic Plan acceptable to the Commissioner to include risk assessment, descriptions of control systems, evaluation of the Bank's internal operations, and creation of a Capital Plan;   (l) submit a plan for implementation of the recommendations of the Commissioner within 60 days;   (m) within 90 days, implement an approved BSA/AML and OFAC Compliance Program to include (i) assessment of resources and staff positions, (ii) conduct risk assessments, (iii) revision and implementation of a Training Program, (iv) implementation of independent testing procedures for evaluating compliance with BSA/AML and OFAC related regulations, and (v) implementation of a revised system of internal controls to ensure full compliance with BSA/AML and OFAC related regulations;   (n) filing quarterly progress reports with the Commissioner;   (o) notification to shareholders, with copies to the Commissioner, of the Order and its findings;   (p) notification to the Commissioner of any criminal, civil, administrative, regulatory investigation, inquiry or action, involving Arival Bank, its officers, directors, employees, consultants, representatives and agents related to Arival Bank's, compliance with sanctions and anti-money laundering laws, and to promptly notify the Commissioner of any matters requiring its attention within 10 business days together with steps taken or planned to address, identify deficiencies, failings, or other matters requiring attention and (q) otherwise as set forth in the Order and the confidential Report.

93.    The findings in the Arival OCFI Order (and the referenced Report that is not public record) covered the period of time that current Deel employees Berger, Pesin and Cavallini were senior compliance-level Arival employees.  Deel hired two of those employees (Berger and Pesin) in 2023 and hired Cavallini in January 2024 such that she was no longer Arival's Global Compliance Officer (conveniently resigning prior to the OCFI's Order and Report) in order to bring her talents to Deel as its Chief Compliance Officer.

31

94.     Deel hired Cavallini *after* the OCFI announced its investigation but before its report was issued, so she is named in the report by title rather than name. Although Berger left Arival in 2023 (claiming to have been bought out but actually forced out), he and Cavallini were both employed by Arival during the time period that the OCFI found material BSA/AML/OFAC compliance failures for which they were responsible. OCFI was particularly critical of Cavallini yet Deel her hired in spite of (or perhaps because of) her contributions to Arival's unlawful and sanctioned activities.

95.     In the Order, Mr. Berger was identified as the Treasurer and Director of Arival Bank until May 2023. Mr. Berger self-identifies as a "Co-Founder @ Arival Bank" and a "Fintech Executive | Regulatory Expansion" in his LinkedIn resume but does not explain what "Regulatory Expansion" means for DPayments and Deel, especially in light of the Order. Berger also claims under "Experience" to have been Arival's "Co-Founder, Board Member & Chief Operating Officer" while the Order identifies him only as the "Treasurer and Director." These titles appear as fluid as their respective duties and dates.

96.     Another founder of Arival is Vladislav Solodkiy ("Solodkiy") who is identified in the OCFI Order sanctioning Arival and who recently authored a post on LinkedIn entitled "High-Risk Compliance." Cavallini (his former co-worker and Deel's current Chief Compliance Officer) re-posted, saying "I totally agree that the solution is not de-risking the perceived higher risk individuals…[but should be] educating bank partners and regulators on how to provide access to the financial system for these individuals and entities in a compliant way. Re-risking is the new trend!"

97.     Perhaps "re-risking" is Defendants' new trend, but Cavallini appears to have reversed the roles of regulators and regulatees by planning to educate them rather than comply with their law to permit onboarding "too risky" clients as she had done at Arival.

98.     As with evidence of other compliance failures by Defendants, evidence of Arival's illegal activities under Berger's and Cavallini's watch is evidence of the absence of mistake by Defendants in connection with their licensing failures and RICO violations.

### Reported Deel Money Transmission and Lending
### Licensing Violations as part of the Deel RICO Enterprise:  Minnesota

99.     Deel has already been found to be in violation of state money transmission and lending licensing laws and therefore in violation of federal BSA/AML/KYC requirements.  In 2024, the Minnesota Department of Commerce ("Minnesota") commenced and settled an enforcement action against Deel, Inc. evidenced by that regulator's Consent Order (copy attached as Exhibit E).[26]

100.     In the Consent Order, Minnesota found that Deel had failed to obtain legally required licenses for money transmission and lending operations[27] in that state.

101.     As in Puerto Rico and Russia, these licensing violations in Minnesota made it more likely that Deel and its customers could avoid regulatory scrutiny and BSA/AML/OFAC compliance because of, inter alia, the lack of effective policies and procedures and the absence of regulatory supervision.

---

[26]  It is not known at this time if DPayments and Berger were party to the Minnesota investigation and enforcement action or whether Minnesota was aware that DPayments and Berger (not Deel in name) had applied for a money transmission license in that state.

[27]  *See,* "Lending," *infra* at para. 111 - 119.

102.     These findings in Minnesota (as in Puerto Rico) underscore the reason for money transmission licensing laws and the underlying systemic risks that regulators work diligently to prevent.  By choosing to seek forgiveness rather than permission in operating regulated businesses without licensing or supervision (just as Deel's former partner Binance had knowingly done[28]), Defendants make it much more difficult for regulators to do their job and cause harm to the Class.

### Deel's PEO Licensing Failures as Part of the
### Deel RICO Enterprise and Evidence of the Absence of Mistake

103.     A professional employer organization (PEO) is an entity which contracts with a client employer to provide employment related services to the client employer's employees, including, payroll, benefits and other related services.

104.     The regulation of PEOs is designed to protect consumers (employees) by, *inter alia*, ensuring that PEO market participants have the requisite knowledge, experience and financial solvency evidenced by initial licensing and registration requirements.  In addition, once licensed, PEOs have ongoing compliance and supervisory obligations and are subject to the enforcement powers of the state.

105.     Forty-three states (including Florida) have laws concerning PEOs and licensing requirements.

106.     For many years, Deel (and later, Deel's PEO subsidiaries) operated without state-required PEO licenses, obtaining such license only when forced to do so.

---

[28] "In a September 2019 chat [with Deel?], [Binance Founder and CEO] Zhao wrote that it was 'better to ask forgiveness than permission" for amassing so many American users despite laws that appeared to forbid doing so, according to prosecutors."  *States Take Aim at Binance.US After CZ Plea*, Caitlin Ostroff, Wall Street Journal, Jan. 25, 2023. https://www.wsj.com/livecoverage/stock-market-today-dow-jones-earnings-01-25-2024/card/states-take-aim-at-binance-us-after-cz-plea-LaSmw4OXrvEsyfibeU91

107.    In 2023, the Florida Department of Business and Professional Regulation ("DBPR") found Deel engaged in PEO "unlicensed activity" (DBPR Finding of Violation, Exhibit F) and thereby violated that state's licensing laws.  Deel had been doing business in Florida for several years as an unlicensed PEO and, when caught and forced to do so, applied for and obtained a Florida PEO license.

108.    DPayments is following the path charted by Deel and its PEO subsidiaries, *i.e.*, engaging in activities requiring a license without a license, getting caught, and then seeking to obtain licenses after-the-fact just as Deel's partner Binance had done, *supra at n.* 31.

109.    As to those money transmission licenses, as alleged previously, state applications were filed beginning in early 2024 in the name of DPayments that identified its single member as DFinancial Holdings, LLC ("DFinancial") and Berger as the sole authorized person.  Like DPayments, DFinancial is a Delaware company with the same St. Petersburg, Florida address as DPayments and Berger.  It is not known whether DPayments, DFinancial or Berger have disclosed to state regulators that Deel controls DPayments, DFinancial and Berger.

110.    Although Plaintiff does not allege at this time that unlicensed PEO activity is, in and of itself, a predicate act under RICO, again, such unlicensed activity is evidence of a pattern of illegal unlicensed activity and that such lack of licensing is not due to mistake but is instead the product of a conscious decision by Deel to not obtain licenses even when required.

### Deel's Unlicensed Lending Activities and the Deel Card as Part of Deel RICO Enterprise and Evidence of the Absence of Mistake

111.    Compliance with BSA/AML/OFAC laws is also mandatory for lending activities, including those connected with money transmitters.  For those reasons, and because of general concerns for consumer protection, lending activities require independent lender licenses in many

states, licenses that Defendants do not have.  *See*, Minnesota Consent Order (Exhibit E)(finding lending licensing violation in addition to money transmitter licensing violation).

112.    As part of its money transmitter, lending and PEO services, Deel offers its payment and financial services through its "Deel Card," "Deel Advance," "Earned Wage Access" and "Early Withdrawal" features, some of which resemble wage factoring and regulatory arbitrage.

113.    The Deel Card allows contractors to "spend securely online or in-stores in any currency."[29]  Deel claims the Deel Card "works the same way as a corporate debit card . . . and it's a great way to get your revenue or earnings for your *contracted services*[30] in a stable currency (USD) . . .". (emphasis added).[31]  The Deel Card may only be "directly funded from your Deel balance; it is not possible to fund the card with outside funds."[32]

114.    Deel charges fees for the Deel Card lending product, including a fee of $5 for virtual cards and $10 for physical cards.  In addition, there are "transaction fees" of 1.5% on many transactions.

115.    Deel appears to offer credit cards as well as debit cards, and a credit card is a loan and credit cards must be issued by a bank.  Deel is not a bank.

---

[29]  The Plaintiff is currently investigating whether Deel is required to obtain additional licenses to engage in financial currency (FX) and cryptocurrency transactions in connection with the Deel RICO Enterprise.

[30]  Deel's promotional materials presume there are no employees, only contractors.

[31]  https://help.letsdeel.com/hc/en-gb/articles/4407737595409-What-is-the-Deel-Card.  Accessed on December 8, 2024.

[32]  https://help.letsdeel.com/hc/en-gb/articles/4407745384721-How-To-Fund-Your-Deel-Card. Accessed on December 8, 2024.

116.    Deel Advance allows "eligible independent contractors to get short-term cash advances" and "lets your contractors receive their paycheck up to 30 days earlier."[33]

117.    While Deel proclaims that "Deel Advance is not a loan - there is no interest rate," it charges a "one-time fixed fee for each advance" equal to 3% of the Advance Amount with a minimum fee of $10 USD.[34]   Advances may be repaid by "[a]utomatic repayment when you receive a payment for any of your clients."[35]

118.    Deel claims these are not loans, but they are precisely that and, in order to make such loans, Deel must be licensed as a lender in accordance with most states uniform lending laws or must partner with a U.S. bank.  There is no mention on Deel's website of a U.S. bank (only a Singapore financial institution, NIUM PTE Ltd., and that is insufficient).

119.    Similarly, Deel's Early Withdrawal is a loan product that allows purported independent contractors to receive payment "up to 5 days before your scheduled payment date, and only once your client has initiated a transfer towards your Deel balance." Persons using Early Withdrawal will pay a "1% fee of the total payment amount to use this feature up to a maximum of $15 USD."[36]

---

[33]    https://help.letsdeel.com/hc/en-gb/articles/9114910826385-Frequently-Asked-Questions-About-Deel-Advance#h_01GD04KZQEX6ERMT83V58F105D. Accessed on December 8, 2024.

[34]    https://help.letsdeel.com/hc/en-gb/articles/9114910826385-Frequently-Asked-Questions-About-Deel-Advance#h_01GD04KZQEX6ERMT83V58F105D. Accessed on December 8, 2024.

[35]    https://help.letsdeel.com/hc/en-gb/articles/9114910826385-Frequently-Asked-Questions-About-Deel-Advance#h_01GD04KZQEX6ERMT83V58F105D. Accessed on December 8, 2024.

[36]    https://help.letsdeel.com/hc/en-gb/articles/9055384544529-What-is-the-Difference-Between-Deel-Advance-and-Early-Withdrawal. Accessed on December 8, 2024.

### Deel's Unlicensed Insurance Activities as Part of
### Deel RICO Enterprise and Evidence of the Absence of Mistake

120.    Deel offers insurance products on its website but does not appear to have an insurance producer's license in Florida or in any other state. Without a producer's license, Deel may not legally transact the business of insurance (offering, selling or facilitating the offering or selling of insurance products) with Florida consumers or Deel client-employers.

121.    Like Florida, most states have uniform licensing and testing requirements as conditions to transacting insurance (insurance is a field left nearly entirely to the states and in which federal law plays only an indirect role). Deel appears to have some relationship with a single individual broker, but on information and belief, such broker is a front for the entire business enterprise and cannot practically operate as broker and Designated Licensed Responsible Person ("DLRP") for the Defendants' insurance transactions in every state and territory.

122.    Although Plaintiff does not allege at this time that unlicensed insurance activity is, in and of itself, a predicate act under RICO, such unlicensed activity is further evidence of a pattern of illegal unlicensed activity and such lack of licensing is not due to mistake but is instead the produce of a conscious decision by Deel to not obtain licenses even when required by law.

### Deel's Employee and Contractor Misclassification as Part of the
### Deel RICO Enterprise and Evidence of the Absence of Mistake

123.    Deel routinely, as part of its corporate mission, misclassifies employees as exempt or as independent contractors, thus potentially depriving employees of employment law benefits and protection such as wage and hour protections (including overtime), and avoiding benefits payments. State and federal lawmakers and agencies have opened investigations or inquiries

regarding Deel's activities, acts and omissions, including an investigation by the California Department of Labor.[37]

124.    Over time, Deel's employee handbook disclosures have evolved from simply saying "We do not provide overtime compensation.  We do not provide compensatory time off (comp time) instead of overtime pay" to saying "Deel will comply with the overtime requirements" to saying "Overtime payment is mandatory for certain types of work and roles at both the Federal level ... and in certain states" while in the very next paragraph still saying "Deel does not support positions that require the calculation of overtime (non-exempt)."

125.    This evolution appears to be in response to Congressional investigations and media reports but, through it all, Deel appears to continue to "not support" non-exempt employees.

126.    Such misclassification cheats employees, of course, including Deel's own employees and those of its platform customers, but also cheats Plaintiff and members of the class who are taxpayers by cheating federal, state and local governments entitled to collect taxes from employees in order to fund social benefits for all workers, including members of the Class.

127.    Misclassification further deprives local, state, and federal governments of income and other tax collections by, *inter alia*, allowing its alleged "contractors" to declare different domiciles whenever and wherever they choose, with little or no verification of actual residence or domicile, and thereby further enabling evasion of tax liabilities.

128.    As part of its misclassification scheme and enterprise, Deel attempts to obtain "cover" by sometimes allowing hires to determine on their own if they "prefer" to be an employee or independent contractor.  Of course, complying with state, local and federal wage and hour and

---

[37]    *See,   e.g.,*   https://www.bloomberg.com/news/articles/2023-07-26/hr-startup-deel-s-labor-practices-should-be-investigated-lawmakers-say?sref=jGKw7E4F, and in Florida (DBPR), see, https://www.businessinsider.com/inside-hr-startup-deel-culture- employment-regulatory-2023-2.

employment laws is not a choice made by an employee but is a requirement set forth in law. Merely offering employees such a choice evidences that Deel cared little about complying with the law and cared much about growth in revenue and profits.

129.    In addition to labor law violations, employee misclassification has the effect of creating more contractors, as opposed to employees, with whom Defendants may contract for profitable unlicensed money transmission activities.

## DEEL RICO ENTERPRISE ADDITIONAL RICO ALLEGATIONS

130.    Defendants are engaged in a common course of conduct and conspiracy involving interstate commerce and the use of wires to gain market share and generate revenues by avoiding and violating state and federal money transmission and BSA/AML/OFAC laws and regulations.

131.    Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), in unlicensed money transmission in violation of state and federal law.

132.    In devising and executing the activities described above, Deel committed acts constituting offenses under 18 U.S.C. § 1960 (relating to unlicensed money transmitters) and §1957 (engaging in monetary transactions in property derived from specified unlawful activity).

133.    Specifically, 18 U.S.C. §1960 prohibits persons engaged in "unlicensed money transmitting business" which includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

134.    These racketeering acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants and methods of operation.

135.   Deel admits that it processed over $10 billion in transactions for its clients and is not properly licensed as a money transmitter in any state.   Although DPayments has recently acquired money transmitter licenses in some states in its name, not in Deel's name, those licenses do not cure Deel's violations, and may be void if found to have been procured without necessary disclosures by Defendants regarding their past conduct.

136.   Deel and other third parties have exclusive custody or control over the records reflecting the precise dates, amounts, locations and details of the thousands of transactions in violation of the racketeering acts including 18 U.S.C. §1960 (relating to illegal money transmitters), §1961(1)(E) (act indictable under the Currency and Foreign Transactions) and §1957 (engaging in monetary transactions in property derived from specified unlawful activity).

## CLASS ALLEGATIONS

137.   Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:

> All persons and entities in the United States who made payments or were party to money transmission activity enabled in whole or in part by any or all Defendants at a time when Defendants lacked money transmission licensing from all authorities having jurisdiction over such activity.

138.   Excluded from the proposed Class are Defendants and co-conspirators, and their officers, directors, agents, trustees, parents, employees, partners and affiliates, and the judges assigned to this action, and any members of their immediate families.

139.   Subject to additional information that may be obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment, amended complaint or via class certification proceedings.

140.   *Numerosity.* Class members are so numerous that joinder of all individual members is impractical. While the exact number and identities of the Class members are unknown at this

time and can only be ascertained through appropriate discovery, Plaintiff alleges that the Class is comprised of thousands of individual members geographically dispersed throughout the United States, including in this district.  This is supported by Deel's claim that its services are used by "teams large and small with 25,000+ businesses across the globe (and counting)" and its claim that it has "hired" 150,000+ workers on behalf of those businesses.[38]  Plaintiff believes that Defendants maintain electronic lists of all money transmission activity and parties, as required by law, such that identification of Class members will be possible with reasonable effort.

141.    *Adequacy of Representation.* Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity, will adequately protect the interests of the Class has no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Class, and has engaged the services of competent counsel experienced in litigation of this nature.

142.    *Existence and Predominance of Common Questions.* The claims of Plaintiff and putative Class members involve common questions of law and fact that predominate over any individualized questions, including, *inter alia*, the following:

a.      Whether Defendants (or any of them) acted as money transmitters or money services businesses;

b.      Whether Defendants (or any of them) had all necessary state and federal licenses and approvals to engage in money transmission;

c.      Whether Defendants (or any of them) acted as money transmitters or other money services businesses required to have, but not having, money transmitter or money services business licenses required by state and federal laws;

---

[38]    https://www.deel.com/about

d.      Whether Defendants (or any of them) prepared and implemented an effective BSA/AML/OFAC program including policies, procedures and personnel;

e.      Whether Defendants (or any of them) obtained monies from the Plaintiff and the Class at a time when Defendants lacked legally required licensing to act as money transmitters, yet engaged in money transmission anyway;

f.      Whether the Plaintiff and members of the Class paid fees to or deposited money with Defendants for money transmission services;

g.      Whether any of the fees or money paid to Defendants, or deposited with them, were used in connection with the Defendants' money laundering activities in Russia or other places;

h.      Whether Defendants have acted in concert to evade, and to continue to evade, and violate applicable laws and regulations;

i.      Whether Berger and DPayments have aided and abetted Deel in connection with the Deel RICO Enterprise;

j.      Whether the Plaintiff and members of the Class have been harmed by Defendants and may recover from Defendants (as disgorgement or otherwise) all monies, including fees, paid by them to the Defendants and determining such other proper measures of relief;

k.      Whether Defendants' actions proximately caused harm to the Plaintiff and the Class;

l.      Whether Plaintiff and the Class members are entitled to an award of damages, treble damages, attorneys' fees and expenses;  and

m.      Whether Plaintiff and the Class are entitled to equitable relief, and if so, the nature of such relief.

143. *Typicality of the Claims or Defenses of the Class Representatives.* Plaintiff's claims are typical of the claims of the members of the proposed Class, each of which has been injured by the same wrongful practices of Defendants. Plaintiff's claims arise from the same practices and conduct that give rise to the claims of all Class members and are based on the same legal theories and enterprise.

144. *Superiority.* A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not and would be faced with the danger of inconsistent and contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, class action procedures provide the benefit of adjudication of these issues in a single proceeding with economies of scale and comprehensive supervision by a single court and present no unusual management difficulties on these facts.

145. *Nature of Notice to the Proposed Class.* The names and addresses of all Class members are contained in the business records maintained by Defendant and are readily available to Defendant. The Class members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class members by e-mail, mail, and published notice.

## COUNT I
### Operation of a RICO Enterprise in Violation of 18 U.S.C. §§ 1960 and 1962

146.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1-145 above, as if fully stated herein.

147.    This claim arises under 18 U.S.C. §§ 1960 and 1962 and is brought against all Defendants.

148.    18 U.S.C. § 1962 provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

149.    At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3) and each knowingly conducted, controlled, managed, supervised, directed, or owned all or part of an unlicensed money transmitting business or money services business and was thereby associated with an illegal enterprise.  In addition, each Defendant conducted and participated in that enterprise's affairs though a pattern of racketeering activity, as defined by 18 U.S.C. §1961(5), consisting of numerous and repeated uses of the interstate wire communications to engage in unlicensed money transmitter activities prohibited by 18 U.S.C. § 1960.

150.    In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c) together with various other persons, firms and corporations not named as defendants in this Complaint who have acted as co-conspirators with Defendants.  Each Defendant aided and abetted violations of the above laws, thereby rendering each indictable as a principal in the offenses under 18 U.S.C. §§1960, 1961(1)(E), 1956, 1957, and 2314, pursuant to 18 U.S.C. §2.

151.     The Deel RICO Enterprise was created or used as a tool to carry out the elements of Defendants' scheme and pattern of racketeering activity[39] within the meaning of 18 U.S.C. § 1961(1) and included ascertainable structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts, including transmitting money without a license in violation of 18 U.S.C. § 1960.

152.     The members of the Deel RICO Enterprise all had the common purpose to maximize Deel's revenues and market share by operating with no effective BSA/AML/OFAC or KYC program to protect their U.S. based customers from bad actors engaged in money laundering and evasion of sanctions.

153.     The Deel RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce by, *inter alia*, operating websites on the Internet that serve customers throughout the United States and the world.  In addition, Deel transmitted monies throughout the United States and the world including the transmission of fiat and crypto currencies.

154.     The Deel RICO Enterprise actively disguised the nature of the Defendants' wrongdoing and concealed or misrepresented their participation and the conduct of the enterprise to maximize their profits and market share while minimizing their exposure to criminal and civil penalties, and while knowingly delaying inevitable licensing enforcement actions as long as possible.

155.     Each of the Defendants exerted substantial control over the Deel RICO Enterprise and participated in the operation and management of the enterprise.

---

[39]  At this time, Plaintiff does not allege that sanctions evasions constitute predicate acts of racketeering but reserves the right to amend this complaint upon further discovery of Deel's payment practices in Russia that may be in violation of U.S. sanctions as well as the money transmitter law violations set forth in this complaint.

156.     Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§1960, 1961(1)(E), 1956, 1957, and 2314, within the past ten years. These multiple acts of racketeering activity were related to each other and therefore constitute a "pattern of racketeering activity."

157.     Deel, aided and abetted by DPayments and Berger, engaged in predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) including, but not limited to:

    a.   operating and conducting, and conspiring to operate and conduct, Deel as an unlicensed money transmitter from its inception in 2019 to the present in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B);

    b.   failing to maintain an effective BSA/AML/OFAC program and collecting and verifying KYC data from many of Deel's platform clients in violation of the BSA and state money transmission laws, including, 31 U.S.C. §§5318(h), 5322;

    c.   enabling bad actors and Deel platform customers who became "contractors," including some in or from sanctioned jurisdictions such as Russia, to avoid BSA/AML/OFAC or KYC programs applicable to them, and thereby turning the Deel platform into a magnet and hub for illicit payment transactions, money laundering and sanctions violations in violation of 18 U.S.C. §1956 (laundering of monetary instruments).

158.     Many of the precise dates and details of the Deel RICO Enterprise cannot be alleged without access to Defendants' books and records.  This is especially so where, as here, the success of the enterprise depended upon secrecy.  Plaintiff and the Class have been injured in their business or property by Defendants' overt acts, and by their aiding and abetting the acts of others.

159.    Plaintiff and the Class have been injured in their property by reason of Defendants' violations of 18 U.S.C. §§1962(c) and (d) and, under the provisions of 18 U.S.C. § 1964(c), the Plaintiff is entitled to bring this action to recover, on her behalf and that of each member of the Class, all monies transferred to Defendants for money transmission and payment related services, all fees paid to Defendants for those services, treble and other damages, the costs of bringing this suit, and costs, interest and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that the Court enter a judgment against Defendants, jointly and severally, and in favor of Plaintiff and the Class:

A. Determining that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Appointing the Plaintiff as the representative of the Class and appointing her counsel as lead class counsel;

C. Finding that Defendants committed the civil RICO violations set forth in this Complaint;

D. Awarding compensatory damages against Deel, including disgorgement of all monies transferred to Defendants for money transmission or related services;

E. Awarding all related fees paid to the Defendants by the Plaintiff and the Class together with all other damages;

F. Awarding statutory treble damages;

G. Enjoining Defendants from continuing to commit the violations alleged herein;

H. Awarding such declaratory, injunctive and other equitable relief against Defendants to prohibit future unlicensed activity;

I.   Awarding the costs of this action, including reasonable attorneys' and expert witnesses' fees and all other costs and expenses of prosecuting this action;

J.   Referring Defendants to federal and state regulators for their own independent review and enforcement proceedings;  and

K.   Awarding such further relief as may be just and proper.

<u>**JURY DEMAND**</u>

The Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

DATED:  January 3, 2025

**JOHNSON POPE BOKOR RUPPEL & BURNS, LLP**

<u>*/s/ Guy M. Burns*</u>
Guy M. Burns, Esq.
Fla. Bar No. 160901
400 N. Ashley Drive, Suite 3100
Tampa, Florida  33602
(813) 225-2500
guyb@jpfirm.com
conniel@jpfirm.com

*and*

**GRADY**LAW™

<u>*/s/ Thomas R. Grady*</u>
Thomas R. Grady, Esq.
Fla. Bar No. 350702
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
trgrady@gradylaw.com

*Counsel for Plaintiff*

**EXHIBIT INDEX**

Exhibit A - Multistate Money Transmitter Licensing & Registration Requirements

Exhibit B - T-Bank (Russian Banking Partner with Deel) Screenshot Promoting Deel for Russian Contractors (Russian)

Exhibit C - T-Bank (Russian Banking Partner with Deel) Screenshot Promoting Deel for Russian Contractors (English)

Exhibit D – OCFI Arival Bank BSA/AML/KYC Violations Consent Order

Exhibit E - Minnesota Consent Order In Re Deel (Unlicensed Money Transmission and Lending)

Exhibit F – Florida DBPR Deel Finding Deel Unlicensed PEO Activity